The issue in this appeal is whether the District Court erred when it held that the plaintiffs lacked standing to assert claims against their investment advisor for fraud in the inducement, violations of state securities laws, and breach of fiduciary duty. Now when we noticed this appeal, we were also appealing the dismissal of claims against third parties who aided and abetted the investment advisor's fraud. Those claims have since settled, and I think that clarifies the issues in this appeal. I submit to you that Louisiana Revised Statute, section 51, colon 714, expressly creates a cause of action for an investor against his investment advisor who materially participates in the sale of securities. We are aware of no case anywhere holding that an investor lacks standing to assert a claim for fraudulent inducement or a state securities law violation against his investment advisor. And the Supreme Court in Blue Chip Stamps, the Delaware Supreme Court in Citigroup, and the Delaware Chancery Court in Activision all described a fraudulent inducement claim as the quintessential personal claim. Does that really get a standing or just a substantive law recovery question? Well, I think that goes to standing because if you have a personal claim, that's a claim that can only be asserted by the plaintiffs. In fact, it doesn't even transfer when you sell your shares. So when you're defrauded in the purchase of securities, that's a unique personal harm to you. And if you later sell those shares to a third party, you still have a claim. In fact, the Louisiana statute expressly recognizes that because it provides for a mechanism of calculating decisionary damages after you've disposed of the security. Now, before I get too far into the law, I want to just briefly discuss the facts of this case because I think the factual background is pretty complicated, but the facts relevant to this appeal are pretty straightforward. The plaintiffs, my clients, are 12 individual investors in three pension funds. They hired the defendants, Morales and his company, Commonwealth, as their investment advisor. The defendants had discretionary authority over my client's investments. Now, Commonwealth specialized in mortgage-backed securities, which is a particularly kind of opaque security. It's not widely traded. It's very hard for investors to value these securities. And rather than invest the plaintiffs directly in these securities, what Commonwealth did was it created funds called the Commonwealth Funds. It sold shares of those funds to my clients, and then it had the funds purchase the mortgage-backed securities and hold the mortgage-backed securities. So the primary allegation in this case is that the defendants misrepresented the price or the net asset value of these funds to the plaintiffs at the point of sale when they sold those funds to the plaintiffs. Because Morales and Commonwealth didn't want to admit to investors that the funds had lost significant value. Essentially, he charged us $1,000 a share for something that was worth a lot less than $1,000 a share when we bought it. And if he had told us the true value, we never would have bought these things in the first place. Now, he accomplished this fraud through several mechanisms. That's why the complaint in this case is very long because we're laying out the whole fraudulent scheme. But the effect of that scheme on the plaintiffs is really simple. We purchased these shares at inflated prices. That means that at the point of sale, we paid far more for the shares than they're worth. And every person deposed, we cite this in our brief at page 23 to 24. They acknowledge that that inflated value means the investors overpaid for their interests at the point of sale. Let me make sure I understand what your friend on the other side is saying in the brief at least. We'll see what he says up here. That they're not investment advisors, that that's not the role that the company defendant played. I must say I don't understand that, and I'm not asking you to defend it. But what do you say to that argument, that they were not investment advisors in this but were third-party non-sellers? I would say that's simply incorrect. I think that if you look at the allegation. Were investment contracts entered between at least some of your clients and the defendant? Yes, Your Honor. There were specific investment contracts that were introduced. I think one of them is cited in the brief. Not for everybody, but for some of the plaintiffs? I'll be honest, Your Honor, it's been a while since I've specifically looked at the documents. I believe they all likely had investment contracts. I know that several of them were submitted in evidence. And as to the pension funds, and I think this is covered extensively in the amicus brief, because they were representing a pension fund, they're a statutory fiduciary and investment advisor to the pension fund. Anybody who has access to pension fund money by statute is a fiduciary and has that responsibility to prudently invest the assets of the pension fund. So I think if there's a factual dispute here about whether they were our investment advisors, I simply don't understand that dispute at all. There was an investment advisory contract between my clients and the defendants. And that's certainly in our allegations. And I think another kind of important point to understand, just a final little factual input here, is that these shares and these funds, these are not publicly traded securities. We didn't buy these from just anonymous people through the market. These are shares we had to buy directly from the funds. And what that means is that when we overpaid for the shares, that means the fund received more for those shares than those shares were worth. Our loss is the fund's gain. So based on those facts.  We bought it from the funds. Directly from the Commonwealth, the high-yield fund, the other Commonwealth funds. And they were sold to his buyer investment advisor who was also, he had two roles. He was our investment advisor. He was also the manager of these funds. So based on those facts, we've asserted three claims. First, we assert a claim for fraud in the inducement, that we purchased these shares based on material misrepresentations about past performance and price. We assert a claim for violation of the State Securities Act, that we purchased these shares based on material misstatements and omissions of fact by our investment advisor who materially participated in the sale. That entitles us to rescissionary damages as defined in that section. I thought you'd already, why is that in the picture since you've gotten rid of the shares? Because if you take a look at the way that that's defined in Section 51-714, it specifically provides that you can obtain rescissionary damages, which is the difference between what you paid for the shares and what you received, the fair market value of them, when you disposed of the shares. So even once you've disposed of the share, you can still bring a claim under the State Securities Act. That way it's not like a derivative claim where you have to still own the asset. And finally, we asserted a claim for breach of fiduciary duty because under Beckstrom v. Parnell, Louisiana Supreme Court case, an investment advisor owes a fiduciary duty to his client not to make material misrepresentations in connection with the sale of securities. Because our investment advisor misrepresented the price to us, that was a breach of that fiduciary duty and we're entitled to the damages from that. So based on all that, if you return to the law of standing, we've asserted these three claims. We're obviously going to have to have a trial to see if we can prove them. You also asserted that Commonwealth mismanaged the funds after you purchased interests in them. We've asserted that the fraud, which was the conduct of Morales and Commonwealth here, it would have had the effect of also harming the funds. I don't think we have – I think there is some loose language in our complaint where we say both that we are seeking the damages from being induced to make and to hold the securities. But if you look at our complaint, we're specifically bringing a state securities law violation. That's a claim that can only be brought at a point of sale transaction. The state securities act, if you look at it, says it's illegal to sell or offer to sell. That's the claim we've had throughout the entire case. And that's a claim that can only be about what happened at the point of sale. And that's been in our complaint the whole time. Are you making other claims that after the point of sale there was mismanagement, that further devalued the value of the funds? Well, I think I'm not specifically making that claim because my damages are set at the point of sale. But if there is further damages after the point of sale, they are responsible compensators for those as well because of the way recisionary damages are calculated. They're liable for the difference between what we pay and the fair value at the time we dispose of it. And if the security further decreases in value, based on that method of calculating the damages – You don't have to prove that they caused the further devaluation. No. In fact, I don't have to – I'm just getting at – Correct. Your question, are you making any claim that post-sale they took actions that damaged the funds and you want additional damages for that? No. The only damages I'm seeking are the recisionary damages at the time of sale, what we paid for it minus what we eventually received for it. Right now you're just seeking standing, right? What? Right now you're just seeking standing. Correct. Right now I'm just seeking the ability to assert the claim. Whether I can prove it is for the – I just want to make sure what your claim is, because I thought there were some of the other in there. I thought there were two categories of claims, but apparently not. No. I think I'm just seeking the recisionary damages. And that's the damages model we presented. Because this case – I mean, we were on the verge of trial. We had a pretrial order. You can look at the agreed facts in the pretrial order. We submitted the dates of every single purchase. It's right there in the pretrial order. We submitted a damages calculation that's literally just what we paid minus what we received. And that's the case we intend to present at trial. So, returning to the law of standing, I think if you look at those cases, Blue Chip Stamps, Citigroup, and Activision, they say this is a personal claim. Okay, so it seems to me what the district judge was focusing on at the time was Thule. Correct. And Citigroup seems to say, maybe we overwrote in Thule, and let's tell you better what we really had in mind. One of my concerns is Citigroup comes into this case pretty late and was raised by you later than perhaps it should have been. There is perhaps not an argument here by opposing counsel, I don't recall. But when did you first raise Citigroup as a possible way to interpret Delaware law? I don't believe we raised Citigroup probably until the appeal. Because although I think Citigroup came out shortly before we briefed our motion for partial summary judgment, we didn't catch it in time to put in our motion for summary judgment. I think it came out, we filed that motion around July 2016 or June 2016. It came out, I want to say, within the month before that. So we did not bring that case to the district court's attention, but we certainly made the argument that Thule shouldn't be applied to these kind of fraudulent inducement claims. We certainly made the argument that lots of courts under Thule had looked at fraudulent inducement claims. We cite those in our brief here and held that those claims are direct claims. And I think Citigroup clarified that Thule doesn't apply to these kind of claims, but I don't think Citigroup changed the law in any kind of retroactive way. I think it just made it clear that when you're talking about fraudulent inducement claims, purchase claims, the Thule analysis simply doesn't apply. It's hard now to go the direction Judge Brady did. So I do think it's very helpful because I don't think Judge Brady was, if he was wrong, he was at least reading a case that could be read more broadly than the Delaware Supreme Court now says it should be. But we'll see if the timing of this matters when you raise Citigroup. My concern about the way this has been presented, and you're not backing off of it, and it seems to be the only way it's been presented in district court, is that it's a matter of standing. It seems to me that the injury that's been alleged here caused by, so the claim is, by the actions of the defendant, is sufficient to give you standing, and the real issue here is not one of standing, but is there a claim? Is there a cause of action? This is a 12b6 case, not a 12b1 case. And I'm not saying that in a way it would simplify your case in a while, but why do you see this as standing, that the same factual issues that go into whether this is, whether your clients have been injured or not, go into the factual determination of whether there is a cause of action as well? The case law generally is that when you're looking at the same facts for the cause of action as you are for whether it's standing or not, we will presume standing and move into whether the claim has actually been shown or not. It's just not the way it's presented. I don't think anything's – what do you make of that? Well, I would say that the defendant certainly raised a 12b6 argument, and that 12b6 motion was not granted. And I think if you looked at this case, even under an Iqbal Twombly standard, I think we've plainly alleged actionable facts under 12b6. I mean, to give you just the simplest, most direct example. You're going a different direction than I want you to, and you can pick up on it if you still think that's the way to go. All I'm saying is it seems to me standing exists in this case arguably, and we need to resolve that in a lot simpler fashion than the parties have been presenting it. It's not a matter of Delaware law and how to figure out what Twombly means and whatever else. It's your basic allegations in the complaint regarding the injury and the actions of the defendant. And whether that actually amounts to anything or not is a merits question. Correct, Your Honor. I mean, that's what we're looking for is the opportunity to present those claims on the merits. And we – you know, there's not been a determination in this case, one way or the other, whether we're going to succeed on these claims. I think we've pled enough that we should be able to go forward with them. And that's why the standing decision was so perplexing to us, because it seems to us we might – Didn't both sides argue to Judge Brady that this is a matter of standing? Well, we argued it because Judge Brady had dismissed our claims against the third party as to standing and not as to commonwealth. And we were preparing for trial. They had an outstanding defense of standing, and we were in the midst of preparing all of our evidence and depositions and everything. I mean, we literally prepared a pretrial order. It's 100-some pages long. And we were going through all this expense, and we said let's not do this if we're going to lose this on standing. So we brought the issue in front of Brady, and we said we clearly have standing to sue our investment advisor. We just want to get that defense out of the way so we can have a trial. And what we got was a dismissal saying we didn't have standing to sue our investment advisor, which, frankly, surprised us. Would it be fair to say that Judge Brady concluded you didn't have a cause of action, and he could have dismissed it under 12b-6 based on his rationale? I don't think so, Your Honor, because he didn't analyze the kind of things you would analyze for a cause of action. He's concerned about double liability or double recovery, which out of time, but perhaps I can address on rebuttal. Those are the, you know, double liability is not something you think about when you're thinking about a cause of action. If they're liable both to us and to the other side, it seems to me that meets the 12b-6 standard. I can go forward on the merits. Then it becomes a standing issue. So I think that he simply didn't make the kind of findings you would expect to make in a 12b-6 case. And for that reason, I think we would easily survive 12b-6 if that analysis performed. And I think in the brief at the very beginning, we outline, you know, why we feel like we've presented not just allegations but evidence that states a claim under the three claims we've asserted. That's right in the very beginning of our brief before we turned to stand. So with that, I'd like to reserve the remainder of my time for rebuttal. Thank you, sir. Mr. Tully. May I please go to Fred Tully on behalf of Commonwealth Advisors and Walter Morales. To clear up one thing, as alleged in the complaint which we had met, Commonwealth Advisors was the registered investment advisor for individual investors in the fund, not only these players but also others who are in court today who are investors in the fund and kind of have a competing claim with these guys. Commonwealth was also the investment advisor to each of the funds. So fiduciary duties were owed to all the investors and all of the funds by Commonwealth. Mr. Morales owned and ran Commonwealth. He was, as alleged in the complaint, he's a chartered financial analyst. He was not an investment advisor nor a registered investment advisor. So you have that distinction. Neither one of them were sellers of securities. The securities were sold by the funds, just like when you invest in a mutual fund. Excuse me just a minute. Who were these two individuals you were distinguishing? Mr. Morales and… Commonwealth Advisors, his company. Who is Mr. Morales? Owned Commonwealth and through Commonwealth. Who was the other individual you were? Just those two. Okay. There was other defendants, the so-called deep pocket broker-dealer defendants. They settled while this appeal was pending. I'm sorry. I'm not trying to complicate it. I withdraw the question. I thought you were naming another natural person. Oh, there are other natural persons, the other investors in the fund. That's the kind of elephant in the room. This case arises out of a Delaware bankruptcy in which a plan was confirmed, setting up a kind of a quasi-litigation trust for the benefit of all investors, not only the plaintiffs here but also the rest of the investors, the majority of investors in the funds, who under the plan were participants in this litigation to sue on behalf of the funds, my clients and some others who had a whole lot more money than my clients did, to collect for the benefit pro rata of all of the investors. This case is very much on all fours. With a case we cited at page 18 of our brief, the Sim Crude case, C-R-U-D-E, involving a litigation trust versus individual claims of fraud brought by some of the investors. And the Third Circuit in that case said the individuals don't have standing. They're relegated to what the bankruptcy court provided. They get to share pro rata with everybody else. That was the deal. That was the plan that was confirmed. We have put the plan into the record. These people, the plaintiffs here, were given an option to be part of that litigation trust or go off on their own and pursue their individual claims against the biggest, deepest pocket defendant, Cantor Fitzgerald, a Wall Street investment firm. They chose to take Cantor's proposed settlement and become members of these funds for litigation purposes. Since then, they've been riding two horses, that horse plus the horse they're trying to pursue here on appeal. I say they shouldn't be permitted to do that. It violates a fundamental bankruptcy law policy of equitable distribution to investors and creditors alike on a pro rata basis. Does this have anything to do with what Judge Brady held, though? Yes, he alluded to the bankruptcy. He alluded to it, but that's not his analysis. He did allude to the fact that to allow them to have standing would prefer some investors over others. Does this have anything to do with Tooley and Citigroup and whatever else? It has. Which seems to be – Indirectly, yes. The Simm-Crude case relies on Smith v. Waste Management out of this circuit as well as Tooley, cited in that decision. All of the case law says the step number one is to look at – to analyze what's been pled. What's been pled here is an 82-page Fifth Amendment amended complaint, which is a masterpiece of detail when it comes to describing what the defendants did to mismanage the assets of the funds. And what the defendants did – You've got to watch that. That's a microphone. When you hit it, it's going to make noise. And what the defendants did to misrepresent the financial state of affairs of the funds. Those are both elements of the funds' cause of action against my clients and others. Mind you, back in the bankruptcy, if these plaintiffs had these rescission claims or claims against this group of defendants that are independent of other investors, they were obliged to bring them and assert them into bankruptcy and have it acknowledged there that they're entitled to a leg up or more money pro rata than others. That wasn't done. They gave up those claims at that time. Claims that they had against the sellers of the securities. Under the Blue Sky Law, that's the primary obligor in a Blue Sky Law claim. The plaintiff is the buyer. The defendant is the seller. And that's what these funds were. They sold securities. If you don't want to read, I recommend your clerks read it. If you don't want to read all 82 pages, read the first 13 paragraphs, which is a high level summary. And in the first 13 paragraphs, you will see almost nothing. As I said, it's a masterpiece of detail concerning what they did to mismanage the funds, the defendants. It has almost nothing. It's a masterpiece of obfuscation as to what the individual claims were and how they're different from other investments. They say in there, it's recited in the summary, that these, Mr. Morales conceived of these hedge funds in 2005. Investors started putting their money in in 2006. And the fraud began in mid-2007. That's what they allege. So to a large degree, maybe not 100%, but to a substantial degree, you're talking about people who've already had their money out, sitting in a checking account somewhere, a bank account. And then Mr. Morales goes off and buys securities. And over time, the values went down. The representations about what the values were started to come out. And then you have a series of detailed, described in detail transactions whereby the value was further diminished. The fraud concerning what the value really was was amplified. And so the details of that fraud begin around mid-2007 and carry through 2008. You cannot tell from this complaint which of those individual investors invested during that time period of the described scheme, which ones invested before the scheme began. You can't tell. There are 14 plaintiffs in this case. Eleven of them are individual persons. Three of them are public employee pension plans. There's a throwaway line here or there about the pension plan investment. But you can't tell whether that's all that they invested, whether they had prior investments. And it's, I say, almost intentionally garbled. Why? Because at the time they brought this suit and filed this Fifth Amendment complaint, they were trying to get to the deep pocket broker dealer from San Francisco, Stone and Youngberg. Who? Stone and Youngberg and its related entities. You'll see paragraph after paragraph, page after page describing Stone and Youngberg's participation in the scheme. Stone and Youngberg is not an investment advisor, is not the seller of any of the securities to these plaintiffs. They're trying to bootstrap a claim against the companies that had the most money to pay and get themselves in a priority position vis-a-vis these people who, in good faith, voted to confirm a plan of arrangement, believing that they would get treated pro rata. As it stands now, my client cannot pay their claim, can't pay their claim. Are you saying S&Y is part of the creditor's group? No, it's the defendant. That's who the creditor's group was after. The creditor's group has a complaint that reads almost identically to this. It's even longer. But it's, they're the same claims. And it's got my client defendants in a position that every dollar they want to pay to the 14th individual plaintiff here is a dollar out of these people's pocket. They're the real parties of interest here. The funds and its investors, which before this settlement, while this appeal was pending, included the 14th. Somehow they were riding both horses out of the bankruptcy. They've jumped back and forth. Now they've jumped off of the funds horse, and now they want to pursue their own and get in a position to beat these guys to judgment. Does that have to, are those really standing issues? They are precisely standing issues. They're issues that the Sim crude decision addressed in the Third Circuit. They're issues that this court acknowledged exist in Smith v. Waste Management. It's a race to judgment situation. Or a, if the defendant can pay, it's a possible double payment. See, I thought the only problem in this case was when I first read it, about it, is that Judge Brady made a mistake in conflating the derivative action with this direct action against the investment advisors for damages, for fraud, and not, as Mr. Burge started off, they misrepresented the value of the securities that they bought. Judge Brady, rest his soul, was sitting there with two complaints in front of him. This one and the ones brought by the funds. And they're identical. For all practical purposes, they're identical. Now who drew up, who filed the second one? Mr. Reasonable on the end in the front row filed the other one, representing the funds. Where's his lawyer? He's the lawyer. He's representing the bankrupt, the debtor reorganized funds, which are, in effect, litigation trusts. Maybe I'm the only person that doesn't know the answer to this. Why is he up here with you? I don't know. Like I say, they're the real party in interest here. Okay. And the proof of that, in all honesty, the proof of that is that when Stoney Youngberg, who was also a defendant in both suits, but Pelley in this, in this case, when it settled with the 14, somehow it required the consent of the funds, and these 14 had to rescind their claims to the funds so they wouldn't get any more money out of the funds. How could that happen when the funds are not in this case, in this appeal? It happened because, you know, the two of them are at odds with each other as to who gets paid and how much and how to allocate it and who, whether either of them, either group of plaintiffs, have the ability to obtain priority over the others. And I say that's governed as a matter of law, as a matter of equity, by what came out of the bankruptcy. Look at that plan. Study it carefully because it says these people, the 14, had an option. They could have turned down their interest in the funds at that time, but they chose to ride the funds horse and consent to the proposed settlement by Canada Fitzgerald. Now they want to jump off that horse and pursue their own claim, but in doing so they have bootstrapped their way onto the funds allegations and described in precise, unbelievable detail the mismanagement of the funds that the defendants are accused of. And they have obfuscated how their individual claims can possibly be different from the claims brought by the funds. For that reason, I ask this Court to affirm Judge Brady and be happy to answer any questions. All right, Counselor. Thank you, sir. Thank you, sir. Respond. Thank you very much, Your Honor. That took an odd turn. I think what I'd respond is, number one, I think if you take a look at Judge Brady's opinion, he specifically addresses this argument at footnote 13, and he rejects it. He says, I don't find that they lack standing because of anything that happened in the bankruptcy court. You can see that right in his opinion. That's why the briefs in this case are about Tooley. I don't think you heard anything from my opposing counsel that addressed why Tooley would bar these claims. Let me see how many of those points I can address. So he acknowledged that there was a fiduciary duty owed to all the investors, and he acknowledged that he was the investment advisor who specifically owed a fiduciary duty to my clients. I think that's an important point in this case because his clients owed two separate fiduciary duties. They owed a fiduciary duty to their investors as an investment advisor, and they owed a fiduciary duty to the funds because they were the manager of the funds. And it's possible that their conduct violated both of these fiduciary duties. I think it probably did. And that gives rise to two separate claims, a claim by the investors for the breach of that fiduciary duty and a claim by the funds for the breach of the fiduciary duty to the funds. Also, explain what he means by this case was affected by what happened when they came out of bankruptcy. There was a bankruptcy in this case, Your Honor, and the funds came back out of bankruptcy. And I don't believe anything that happened in the bankruptcy affected our ability to assert these claims. Certainly that wasn't what Judge Brady found. It is true that the funds were put into bankruptcy. They were reconstituted. The funds came out of bankruptcy. And when they came out of bankruptcy, the funds asserted a claim directly against Commonwealth Advisors as their manager. That's the other companion case. But our case is separate from that. It was filed before the bankruptcy. It survived the bankruptcy, and it continued on through to today. I don't think there's anything that happened in the bankruptcy that forecloses our case. And I'd submit to you that if there was, you'd have an order in front of you from the bankruptcy court or from Judge Brady saying that our case was barred by the bankruptcy. You don't have that. Okay. If you're seeking rescission, to me it seems like the measure of damages would be the difference between what the plaintiff paid for the funds and the true value of the funds on the date of that transaction. Well, I would submit that's certainly part of our damages. I think Louisiana law under 51714, if you take a look at the statute, it defines it differently because it doesn't ask you to prove the value on the date. It's the value at the time you dispose of it. But I think that gets to an important point, which is that at the point of sale, our clients overpaid for these securities. The opposing counsel made a point about sales happened at different times. Well, all of the information is in the record, the exact date of every one of our purchases. And many of our people, somebody, one of the pension funds put in $12 million in June 2008. There's no question these funds were worth a fraction of that at the time he put it in. Okay. So you just figure out what the fund's actually worth on that date, and then you get a differential, and then you subtract from that what you actually got when you sold the funds, without regard to any mismanagement that took place in between. What is your complaint? Why is there so much detail in the complaint about mismanagement that occurred after the sales? I was asking that person. He said there isn't any claim, but he says there clearly is. In the memos I'm reading, there are such claims. We had to put in the evidence under Twombly and Iqbal in 9b to show that there's a fraud. He makes a point about Stone and Youngberg.  There are a lot of allegations in this case that are meant to show this was a fraudulent scheme. About stuff that happened after the sale. There is some stuff that goes beyond. I think the last sale, if you take a look, is June 2008, although I should confirm that. But there may have been one sale after that. But there is most of the conduct that is described in our complaint is prior to the last sale in June 2008, there is some conduct after that that I think reflects back on the fact that what happened before June 2008 was fraudulent. And that's the evidence we'd have to put in. If we didn't put in all those allegations about how they were acting as managers of the funds, about how the fraud happened, we'd get dismissed under the theory that we hadn't pled enough detail of the fraud. That's why our complaint is so long, but I think the claims are very straightforward. And if you look at the state securities law violation, that's a claim that's a point-of-sale violation. And this is kind of an important point about the difference between our claims and their claims. If you take a look at the complaints, they're very different lengths. Our complaint is about half their length. It's got about half as many paragraphs. But our specific state securities violation claim, it talks about the fraud in connection with inducing us to make purchases. They have a state securities violation claim where they're complaining about transactions that the fund took. Who is they? They, the funds. And they're a separate complaint. They have a complaint where they complain about transactions between the funds and other funds or transactions between the funds and third parties like Stone and Youngberg. They're complaining about different transactions than we're complaining about because we are complaining about the transactions that specifically hurt us personally, where we have the personal claims. I'd submit if you look at Tooley and Citigroup, those are claims where we have standing to bring them. And so with that, I'm out of time unless there are further questions. Just to be clear, you're sure you're both here on the same case? All right. I believe we are. That's a yes, I guess. Thank you very much. Very good argument. We'll take them under advisement. And this panel will adjourn until now.